IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUBERT C. PINCON, derivatively on behalf of MERGE HEALTHCARE INCORPORATED, <br><br> Plaintiff, <br><br> vs. <br><br> DENNIS BROWN, MATT MALONEY, MICHAEL W. FERRO, JR., JEFFREY A. SURGES, JUSTIN C. DEARBORN, STEVEN M. ORESKOVICH, NEELE STEARNS, JR., RICHARD A. RECK, and NANCY J. KOENIG, <br><br> Defendants, <br><br> - and - <br><br> MERGE HEALTHCARE INCORPORATED, a Delaware corporation, <br><br> Nominal Defendant. | Case No. 14 C _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) BREACH OF FIDUCIARY DUTY** <br> **(2) ABUSE OF CONTROL** <br> **(3) GROSS MISMANAGEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
E-mail:    fbottini@bottinilaw.com
           achang@bottinilaw.com

THE LAW OFFICES OF
   EDWARD T. JOYCE & ASSOCIATES, P.C.
Edward T. Joyce
Rowena T. Parma
135 South La Salle Street, Suite 2200
Chicago, Illinois 60603
Telephone: (312) 641-2600
Facsimile: (312) 641-0360
E-mail:    ejoyce@joycelaw.com
           rparma@joycelaw.com

*Attorneys for Plaintiff Hubert C. Pincon*

Dated: February 21, 2014

# Table of Contents

NATURE OF THE ACTION ............................................................................ 1

JURISDICTION AND VENUE........................................................................4

THE PARTIES ...................................................................................................5

    I.      Plaintiff.........................................................................................5

    II.     Nominal Defendant......................................................................5

    III.    The Individual Defendants ..........................................................5

FIDUCIARY DUTIES OF THE DEFENDANTS......................................... 10

    I.      Duties as the Company's Directors and Officers ....................... 10

    II.     Duties Under GAAP ................................................................... 13

    III.    Duties of Reasonable and Prudent Supervision ........................ 15

    IV.   Duties Under the Audit Committee Charter................................ 16

    V.     Duties Under the Company's Code of Ethics............................. 18

BREACHES OF FIDUCIARY DUTIES............................................................. 19

CONTROL, ACCESS, AND AUTHORITY........................................................ 21

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION...................... 21

FACTUAL ALLEGATIONS............................................................................23

    I.      *Ultra Vires* Stock-Option Awards to Surges and One Other Employee ....23

    II.     False or Misleading Statements.................................................. 25

DAMAGES TO MERGE HEALTHCARE ......................................................43

DERIVATIVE ALLEGATIONS......................................................................44

    I.      Demand Is Futile as to Dearborn................................................44

    II.     Demand Is Futile as to Brown and Reck ................................... 45

    III.    Demand Is Futile as to Brown, Reck, and Stearns ...................48

    IV.   Demand Is Futile as to All Director Defendants ........................49

V.      Demand Is Futile for Additional Reasons ................................................... 51

CLAIMS FOR RELIEF........................................................................................................ 54

Count I
Against the Individual Defendants
for Breaches of Fiduciary Duties ....................................................................... 54

Count II
Against the Individual Defendants
for Abuse of Control........................................................................................... 55

Count III
Against the Individual Defendants
for Gross Mismanagement ................................................................................. 56

PRAYER FOR RELIEF ....................................................................................................... 56

DEMAND FOR JURY TRIAL............................................................................................. 58

Plaintiff Hubert C. Pincon, derivatively on behalf of Merge Healthcare Incorporated ("Merge Healthcare" or the "Company"), files this Verified Shareholder Derivative Complaint against Dennis Brown, Matt Maloney, Michael W. Ferro, Jr., Jeffrey A. Surges, Justin C. Dearborn, Steven M. Oreskovich, Neele Stearns, Jr., Richard A. Reck, and Nancy J. Koenig (collectively, the "Individual Defendants") for breaches of their fiduciary duties as the Company's directors and/or officers (Count I), abuse of control (Count II), and gross mismanagement (Count III). In support of these claims, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.     This is a shareholder derivative action which seeks to remedy wrongdoing committed by Merge Healthcare's directors and officers between November 5, 2010 and the present (the "Relevant Period"). During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of Merge Healthcare by engaging in *ultra vires* acts and breaching their duty of candor. Specifically, the Individual Defendants:

(a)     approved at least two stock-option awards, including a 2010 award to then-Chief Executive Officer ("CEO") Jeffrey A. Surges of 1,500,000 shares of the Company's common stock, that exceeded the number of shares authorized under the relevant stock-option plan (the award to Surges represented 975,000 more shares than what was permitted under the 2005 Equity Incentive Plan (the "Incentive Plan"));

(b)     caused the Company to issue false or misleading statements that misreported the Company's backlog, revenues and income in violation of

1

Generally Accepted Accounting Principles ("GAAP") and the Company's own internal accounting standards;

    (c)    failed to promptly disclose that a Company employee seeking to gain $250,000 in commissions had committed fraud by simply making up sales contracts; and

    (d)    failed to timely disclose these and other material facts to shareholders.

The Individual Defendants also breached their fiduciary duties by falsely representing that Merge Healthcare maintained adequate internal controls when, in fact, the Individual Defendants knew that such controls were materially deficient. These violations have subjected the Company to multiple lawsuits and have already cost, and will continue to cost, the Company millions of dollars.

    2.    Headquartered in Chicago, Illinois, Merge Healthcare provides innovative enterprise imaging, interoperability, and clinical systems that seek to advance healthcare. Merge Healthcare's enterprise and cloud-based technologies for image intensive specialties provide access to any image, anywhere, any time. Merge Healthcare also provides clinical trials software with end-to-end study support in a single platform and other intelligent health data and analytics solutions.

    3.    The Individual Defendants, as past and present members of the Executive Team and the Board of Directors (the "Board"), have knowingly or recklessly breached their fiduciary duties of good faith, fair dealing, and candor, and failed to control and manage Merge Healthcare in a fair, just, honest, and equitable manner to the best of their abilities.

2

4.     The members of the Board breached their duty of candor because they failed to promptly disclose to the Company's shareholders that a Company employee had intentionally fabricated contracts in an effort to book fictitious orders and increase the employee's revenues.  The Company recently disclosed that the Board learned of this fraudulent conduct in September 2013, yet intentionally delayed disclosing this material information to the market for over three months.  On January 8, 2014, ***over three months after learning the true facts***, the Board finally and belatedly disclosed to the market that a former employee's attempt to reach sales quotas and garner $250,000 in additional commissions had simply fabricated sales orders.   The Company disclosed that day that the former employee, who had worked in its eClinical business, ***had resigned in September 2013***.  Fraud is always material, in any amount, and the Board should have disclosed the employee's fraud back in September 2013 when the employee was forced to resign.  By failing to disclose this material information, which it knew or recklessly disregarded, the Board members breached their fiduciary duties of candor and loyalty.

5.     The Board also breached its duty of candor by not disclosing the true reasons for the resignations of the Company's General Counsel, Ann Mayberry-French, and of Defendants Jeffrey A. Surges and Michael W. Ferro, Jr.  On May 20, 2013, the market first learned that on May 17th, Mayberry-French had suddenly and without explanation "resigned."  On August 9, 2013, the market first learned that on August 5, 2013, Surges had suddenly and without explanation "resigned" as Merge Healthcare's CEO.  The Board also breached its duty of candor by not disclosing the true reasons for Ferro's August 26, 2013 "resignation."

3

6.      In light of their conduct, which has subjected the Company to being named as a defendant in a federal securities class action, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.  Because all the Board members breached their duties of good faith, candor, and loyalty by not promptly disclosing the fraud which occurred and not promptly disclosing the reasons for the "resignations" of Mayberry-French, Surges, and Ferro, such director defendants face a substantial likelihood of liability in this action and are therefore interested.  Breaches of the duties of good faith, candor and loyalty cannot be indemnified by the Company.

7.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or reckless breaches of fiduciary duties and other misconduct.

8.      This action seeks to recover damages and obtain injunctive relief on the Company's behalf.

## JURISDICTION AND VENUE

9.      Jurisdiction is conferred by 28 U.S.C. § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' preparation and/or dissemination of false or misleading information—occurred in this District, and the Individual Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

11.     Each Defendant has minimum contacts with Illinois, as they have entered into contracts in Illinois, or have frequently traveled here, on Merge Healthcare business, or have authorized acts and actions that have had a sufficient impact in Illinois or on Merge Healthcare's shareholders and investors residing here to justify the exercise of jurisdiction over them.

## THE PARTIES

### I.     Plaintiff

12.     Plaintiff Hubert C. Pincon is a current shareholder of Merge Healthcare. Plaintiff has been a shareholder of Merge Healthcare since March 22, 2006, and has continuously held his Merge Healthcare stock during the entire Relevant Period. Plaintiff is a citizen of the State of New York.

### II.     Nominal Defendant

13.     Nominal Defendant Merge Healthcare is a Delaware Corporation with its principal place of business located at 350 North Orleans Street, 1st Floor, Chicago, Illinois 60654.  During the Relevant Period, Merge Healthcare's stock was listed and traded on the NASDAQ Exchange under the ticker "MRGE."  Merge Healthcare is a citizen of the States of Delaware and Illinois.

### III.     The Individual Defendants

14.     Defendant Dennis Brown ("Brown") is a Director of the Company and serves on the Company's Audit Committee, Compensation Committee (as Chair), and Nominating and Governance Committee.  Brown presently serves as Senior Executive Vice President and Chief Financial Officer for Karl's Event Rental Inc. and previously served as Vice President of Finance, Chief Financial Officer and Treasurer of Apogent Technologies Inc. ("Apogent"), a New York Stock Exchange company from January

2003 to December 2004. Fisher Scientific International Inc. acquired Apogent in August 2004, and after completion of a transition period, Brown retired from Apogent in December 2004. From December 2000 through January 2003, Brown served as a Financial Consultant to Apogent. Brown also served as Vice President of Finance, Chief Financial Officer and Treasurer of Apogent's predecessor, Sybron International Corporation ("Sybron"), a publicly traded company formerly headquartered in Milwaukee, Wisconsin, from January 1993 through December 2000, at which time Sybron's Life Sciences Group was relocated to Portsmouth, New Hampshire, and Sybron was renamed Apogent. Brown is a Fellow of the Chartered Institute of Management Accountants (England). Brown has served on Merge Healthcare's Board since May 2003 and previously served on the Company's Board from the date of its initial public offering in February 1998 until May 2000. Brown is a citizen of the State of Wisconsin.

15.     Defendant Matt Maloney ("Maloney") is a Director of the Company and serves on the Company's Compensation Committee. Maloney is the co-founder and CEO of GrubHub, an online and mobile food ordering platform. Before GrubHub, Maloney managed technology development at Apartments.com, a subsidiary of Classified Ventures. Maloney also has a background in radiology from when he worked at the University of Chicago's Department of Radiology from 1998 to 2000, developing advanced CAD schemes for detection and classifications of masses and clustered microcalcifications. Maloney is a citizen of the State of Illinois.

16.     Defendant Justin C. Dearborn ("Dearborn") is a Director of the Company. Dearborn is Chief Executive Officer of Merge Healthcare. Dearborn has served as President of Merge Healthcare since November 2010, and as Chief Executive Officer since June 2008. Before joining Merge Healthcare, Dearborn served as Managing

6

Director and General Counsel at Merrick Ventures, LLC.  Before his roles at Merrick

Ventures, Dearborn served in various executive senior management positions for Click

Commerce, Inc., a publicly-traded software and services company.  Dearborn was

appointed Corporate Secretary of Click Commerce in May 2003.  Before Click

Commerce, Dearborn worked at Motorola, Inc. where he specialized in intellectual

property transactions and held management positions in Motorola's Semiconductor and

Government Groups.  Dearborn is a citizen of the State of Illinois.

17.     Defendant Neele Stearns, Jr. ("Stearns") is a Director of the Company, and

has been since June 4, 2008.  Stearns is also Chair of the Company's Audit Committee.

Since February 2001, Stearns has served as chairman of Financial Investments

Corporation, a private equity investment firm.  From July 2004 to April 2007, he also

served as the chief executive officer of Boulevard Healthcare, LLC, an owner and

operator of nursing homes, of which he is still chairman.  From September 15, 2003 to

January 15, 2004, Stearns took a leave of absence from Financial Investments

Corporation to serve as interim chairman and chief executive officer of Footstar, Inc.  In

March 2004, Footstar, Inc. filed for U.S. Chapter 11 bankruptcy.  Stearns remained as a

director of Footstar, Inc. until it emerged from bankruptcy in February 2006.

Previously, Stearns was chairman of the Board of Wallace Computer Services, Inc., then

a provider of printed products and print management services, from January 2000

through November 2000 as well as serving as a director from 1996 until its sale to

Moore Corporation Limited in 2003.  Before 1995, he was president and chief executive

officer of CC Industries, Inc., a diversified holding company.  Stearns served on the

board of Maytag Corporation from 1989 through its sale to Whirlpool Corporation in

March 2006. Stearns holds an M.B.A. from Harvard Business School. Stearns is a citizen of the State of Illinois.

18.     Defendant Richard A. Reck ("Reck") is a Director of the Company and serves on the Company's Audit Committee, Compensation Committee, and Nominating and Governance Committee (as Chair). Reck is the president of Business Strategy Advisors LLC, a business strategy consulting firm, and has served in such capacity since August 2002. Reck joined the certified public accounting firm of KPMG LLP in June 1973 and remained employed there until his retirement as a partner in July 2002. He currently serves on the boards of Interactive Intelligence, Inc., a publicly held software company, and Advanced Life Sciences Holdings Inc., a publicly held biopharmaceutical company, as well as the boards of several private and not–for–profit entities. Reck is a certified public accountant and holds a B.A. in Mathematics from DePauw University and an M.B.A. in Accounting from the University of Michigan. Reck has served as a Director of the Company's Board since April 2003. Reck is a citizen of the State of Illinois.

19.     Defendant Nancy Koenig ("Koenig") is a Director of the Company, as well as the Chief Operations Officer at Merge Healthcare. Before joining Merge Healthcare, Koenig worked at Merrick Healthcare Solutions, where she served as its Chief Executive Officer. Before joining Merrick Ventures, Koenig was the President of Click Commerce during its integration as a subsidiary of ITW. Koenig joined Click Commerce as the director of business consulting and held various positions, including the head of Click Commerce's European Operations, Vice President of Product Operations and Marketing, and Executive Vice President, Operations. Koenig became Click Commerce's president in 2006. Koenig is a citizen of the State of Illinois.

20.     Defendants Brown, Maloney, Stearns, Dearborn, Reck, and Koenig are sometimes referred to as the "Director Defendants."

21.     Defendants Brown, Stearns, and Reck are sometimes referred to as the "Audit Committee Defendants."

22.     Defendant Steven M. Oreskovich ("Oreskovich") is the Chief Financial Officer and Treasurer of Merge Healthcare.  Before his appointment as Chief Financial Officer and Treasurer, Oreskovich served in various roles within the Company since April 2004 including: Chief Accounting Officer, Vice President of Internal Audit and Vice President and Corporate Controller.  Before joining the Company, Oreskovich served as vice president of finance and operations at Truis, Inc., a company that provided customer intelligence solutions for business-to-business enterprises, from April 2000 to January 2003.  Before that, Oreskovich worked as an auditor at PriceWaterhouseCoopers LLP from September 1994 to April 2000.  Oreskovich holds a B.S. degree in Accounting from Marquette University and is a C.P.A.  Oreskovich is a citizen of the State of Illinois.

23.     Defendant Michael W. Ferro, Jr. ("Ferro") served as a Director of the Company and as the Chairman of the Board from June 4, 2008 until his resignation on August 26, 2013.  Ferro is a citizen of the State of Illinois.

24.     Defendant Jeffery A. Surges ("Surges") served as a Director of the Company and as Merge Healthcare's CEO from November 2010 until his resignation on August 5, 2013.  Surges is a citizen of the State of Illinois.

25.     Defendants Brown, Maloney, Stearns, Dearborn, Reck, Koenig, Ferro, Surges, and Oreskovich are sometimes collectively referred to herein as the "Individual Defendants."

9

## FIDUCIARY DUTIES OF THE DEFENDANTS

### I.   Duties as the Company's Directors and Officers

26.   By reason of their positions as officers, directors, and fiduciaries of Merge Healthcare and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Merge Healthcare and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage Merge Healthcare in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27.   Each director and officer of the Company owed and owes to Merge Healthcare and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.   The Individual Defendants, because of their positions of control and authority as directors and officers of Merge Healthcare, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained herein.

29.   To discharge their duties, the Individual Defendants, as officers and directors of Merge Healthcare, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to the charter and bylaws of Merge Healthcare;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Merge Healthcare conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Merge Healthcare and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Merge Healthcare's operations would comply with all laws and Merge Healthcare's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

11

(g)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

30.   Each Individual Defendant, by virtue of his or her position as a director or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as directors and officers of Merge Healthcare, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.   The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Board at all relevant times.

31.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and

12

accurate information.  The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Accordingly, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

32.     At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

## II.     Duties Under GAAP

33.     In issuing its financial statements, Merge Healthcare was required to comply with GAAP — a common set of accounting principles, standards, and procedures recognized by the accounting profession and used to compile financial statements.

34.     According to Merge Healthcare's Form 10-K, the Company's management is significantly involved in determinations regarding revenue recognition due to a variety of factors which require management to interpret Merge Healthcare's contracts and exercise judgment with respect to whether revenue should be recognized.  Merge Healthcare's Form 10-K for 2013 discusses those issues as follows:

*Revenue Recognition*

Revenues are derived primarily from the licensing of software, sales of hardware and related ancillary products, SaaS offerings, installation and engineering services, training, consulting, and software maintenance and EDI.  Inherent to software revenue recognition are significant management estimates and judgments in the interpretation and practical application of the complex rules to individual contracts.  These interpretations generally would not influence the amount of revenue recognized, but could influence the timing of such revenues.  In addition, revenue results are difficult to predict, and any shortfall in revenue or delay in recognizing revenue could cause our operating results to vary significantly from period to period.  Significant areas of judgment include:

• The determination of deliverables specified in a multiple-element arrangement and treatment as separate units of accounting;

• Whether separate arrangements with the same customer executed within a short time frame of each other are a single arrangement;

• The assessment of the probability of collection and the current credit worthiness of each customer since we generally do not request collateral from customers;

• The determination of whether the fees are fixed and determinable

• Whether or not installation, engineering or consulting services are significant to the software licensed; and

• The amount of total estimated labor hours, based on management's best estimate, to complete a project we account for under the input method of percentage of completion accounting. We review our contract estimates periodically to assess revisions in contract values and estimated labor hours, and reflect changes in estimates in the period that such estimates are revised under the cumulative catch-up method.

Typically, our contracts contain multiple elements, and while the majority of our contracts contain standard terms and conditions, there are instances where our contracts contain non-standard terms and conditions. As a result, contract interpretation is sometimes required to determine the appropriate accounting. We analyze our multiple element arrangements to determine the estimated selling price of each element, the amount of revenue to be recognized upon shipment, if any, and the period and conditions under which deferred revenue should be recognized. As a result, if facts and circumstances change that affect our current judgments, our revenue could be materially different in the future.

35. Merge Healthcare's 2013 Form 10-K also disclosed the following with

respect to its policies regarding revenue recognition and compliance with GAAP:

Use of Estimates

Our consolidated financial statements are prepared in accordance with United States of America (U.S.) generally accepted accounting principles (GAAP). These accounting principles require us to make certain estimates, judgments and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Estimates are used when accounting for items and matters such as revenue recognition and allowances for uncollectible accounts receivable and sales returns, inventory obsolescence, depreciation and amortization, long-lived and intangible asset valuations, impairment assessments, restructuring reserves, taxes and related valuation allowance, income tax provisions,

stock-based compensation, and contingencies.  We believe that the estimates, judgments and assumptions are reasonable, based on information available at the time they are made.  Actual results may differ from those estimates.

## III.　Duties of Reasonable and Prudent Supervision

36.　To discharge their duties, the officers and directors of Merge Healthcare were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Merge Healthcare were required to, among other things:

(a)　refrain from acting upon material inside corporate information to benefit themselves;

(b)　ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)　conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)　properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)　remain informed as to how Merge Healthcare conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and

take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)    ensure that Merge Healthcare was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## IV.    Duties Under the Audit Committee Charter

37.    The Company's Audit Committee, consisting of Defendants Brown, Reck, and Stearns, is responsible for ensuring the integrity of the Company's financial statements and the adequacy and effectiveness of the Company's internal controls over financial reporting.  The Company's Proxy Statement notes that the Audit Committee oversees the Company's financial reporting process on behalf of the Board of Directors.

38.    The conduct of the Audit Committee is governed by the Audit Committee Charter.

39.    Merge Healthcare's Audit Committee Charter states the following with respect to the Audit Committee's duties:

"The Committee's functions may be divided into the following general categories:  (1) overseeing financial reporting, (2) evaluating independent audit processes, (3) reviewing internal controls established by management, and (4) other functions. The Committee shall:

1. Financial Information and Reports

(a) Review with the Public Accountants and the Company's management the interim financial statements to be included in each of the Company's Quarterly Reports on Form 10–Q prior to the public announcement  of financial results and the filing of the Form 10–Q with the SEC

(b) Review with the Public Accountants, the Company's management and the persons performing the Company's internal audit function, the Company's annual financial statements to be included in the Company's Annual Report on Form 10–K prior to the public announcement of financial results and the filing of the Form 10–K with the SEC

16

(c) Review the disclosure under "Management's Discussion and Analysis and Analysis of Financial Condition and Results of Operations" in each Annual Report on Form 10–K and Quarterly Report on Form 10–Q, prior to the filing thereof with the SEC

(d) Review the Company's press releases announcing financial results or financial forecasts of the Company prior to their dissemination

(e) Discuss with the Public Accountants their judgments about the quality, not just the acceptability, of the Company's accounting principles and financial disclosure practices used or proposed and the appropriateness of significant management judgments

(f) Discuss with the Company's management and the Public Accountants the effect of regulatory and accounting initiatives, as well as any off–balance sheet structures, on the Company's financial statements

(g) Review a report from the Public Accountants periodically, but no less than annually, as to (i) all critical accounting policies to be used, (ii) all alternative disclosures and treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with the Company's management, the ramifications of the use of such alternative disclosures and treatments and the disclosures and treatments preferred by the Public Accountants, and (iii) other material written communications between the Public Accountants and the Company's management, including management letters and schedules of unadjusted differences

(h) Recommend to the Board, based upon the review and discussion described above, whether the consolidated financial statements should be included in the Company's Annual Reports on Form 10–K

(i) Based upon discussions with, and reliance upon, the Public Accountants and the Company's management, prepare any audit committee reports or other audit committee–related disclosure, in filings with the SEC or otherwise, required by applicable securities laws, rules and regulations or by the rules of any securities exchange or market on which securities of the Company are listed, including a report to be included in the Company's annual meeting proxy statement stating whether the Committee has (i) reviewed and discussed the audited financial statement with management, (ii) discussed with the Public Accountants the matters required to be discussed by Statement on Auditing Standards No. 61, (iii) received from the Public Accountants disclosures regarding their independence required by Independence Standards Board Standard No. 1 and (iv) discussed with the Public Accountants their independence. The proxy statement shall also contain a statement as to whether the Committee members are independent and that the Committee has adopted a charter.

(j) Periodically, but no less than annually, review the financial statements and related reports for the Company's retirement plan(s).

## V.    Duties Under the Company's Code of Ethics

40.    The Code of Ethics governs the conduct of all the Company's directors, officers, and employees. It was adopted by the Board on November 20, 2008, and provides that "It is critical to the Company's success, and in the best interests of its stockholders, that the Company conduct business in an honest and ethical manner. Accordingly, each director, officer and employee of the Company, including its Chairman, its Chief Executive Officer and its Chief Financial Officer, must observe the highest standards of honest and ethical business conduct, including strict adherence to this Code."

41.    The Code of Ethics requires all of the Company's employees (including directors and officers) to adhere to the following requirements with respect to the Company's books, records, and financial statements:

### Integrity and Accuracy of Financial Statements and Use of Company Assets

Each director, officer and employee must act in a manner that, to the best of his or her knowledge, will cause the Company to undertake the following responsibilities:

• Prepare full, fair, accurate, timely and understandable financial information, statements, reports and recommendations after appropriate analyses of relevant and reliable data.

• Use no funds or assets of the Company for any purpose that would violate any applicable law or regulation.

• Make no contribution to any political candidate, party or campaign in the United States of America or elsewhere.

• Not establish or maintain any fund, asset or account that is not properly reflected on the Company's books and records.

18

• Make no false, artificial, or misleading entries in the Company's books and records.

• Effect no transaction or payment by or on behalf of the Company with the intention or understanding that the transaction or payment is other than as described in the documentation evidencing the transaction or supporting the payment.

## BREACHES OF FIDUCIARY DUTIES

42.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Merge Healthcare and to its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Merge Healthcare, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as directors and officers of Merge Healthcare, the absence of good faith on their part, or a reckless disregard for their duties to Merge Healthcare and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Merge Healthcare.

43.     The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or failing to disclose that:

(a)     both the existence and value of millions of dollars of eClinical customer contracts had been falsified, and as a result, the Company's reported subscription backlog and its reported increase in backlog was false and overstated during the six quarters ended September 30, 2013;

(b)     the Company was experiencing a "continued reluctance amongst large health systems to move forward with enterprise purchases";

19

(c)     Merge Healthcare lacked effective internal controls and its disclosure controls were not effective and had not been designed to provide reasonable assurance regarding the reliability of financial reporting";

(d)     Merge Healthcare had a deficiency in its internal controls which resulted in the failure to properly log and verify customer contracts, the failure to appropriately calculate commissions, and the compensation of salesmen based on purported, and even falsified, contract signings rather than actual cash collections; and

(e)     as a result, Defendants lacked a reasonable basis for their positive statements about the Company and its business.

(f)     In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of federal securities laws.  As a result, Merge Healthcare has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

44.     Throughout the Relevant Period, in violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over accounting and financial reporting and consciously disregarded their duties to monitor such controls and accounting.  The Individual Defendants' complete failure to perform their duties in good faith resulted in the Company issuing false and misleading financial statements to  the SEC, the investing public, and the Company's shareholders.

## CONTROL, ACCESS, AND AUTHORITY

45.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Merge Healthcare.

46.     Because of their advisory, executive, managerial, and directorial positions with Merge Healthcare, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Merge Healthcare.

47.     Each of the Individual Defendants was the agent of each of the other Defendants and of Merge Healthcare, and was at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (a) millions of dollars of eClinical customer contracts had been falsified, and as a result, the Company's reported subscription backlog and its reported increase in backlog was false and overstated during the six quarters ended September 30, 2013; (b) the Company was experiencing a "continued reluctance amongst large health systems to

move forward with enterprise purchases"; (c) Merge Healthcare lacked effective internal controls and its disclosure controls were not effective and had not been designed to provide reasonable assurance regarding the reliability of financial reporting"; (d) Merge Healthcare had a deficiency in its internal controls which resulted in the failure to properly log and verify customer contracts, the failure to appropriately calculate commissions, and the compensation of salesmen based on purported, and even falsified, contract signings rather than actual cash collections; and (e) as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times. In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.

50.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue false or misleading financial results based upon non-existent revenue or based on revenue that was improperly recorded in the earlier period than it was earned.

51.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's financial results and future business prospects.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper

statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

54.     Merge Healthcare develops software solutions designed to enable hospitals, imaging centers, integrated delivery networks, and health information exchanges to create information exchanges within their environments and with other entities worldwide. The Company's customers include healthcare providers ranging in size from single provider practices to large health care systems, to the sponsors of clinical trials and medical device manufacturers. By the end of fiscal 2012, the Company claimed that its products were licensed by more than 1,500 hospitals, 6,000 clinics and labs, 250 medical device manufacturers and by top pharmaceutical companies worldwide.

## I.     *Ultra Vires* Stock-Option Awards to Surges and One Other Employee

55.     On November 5, 2010, in connection with Defendant Surges becoming Merge Healthcare's CEO, the Compensation Committee (which at the time was composed of Defendants Brown (Chairman) and Reck, and non-party Gregg G.

Hartemayer) granted Surges options to purchase 1,500,000 shares of the Company's common stock. This represented 975,000 more shares than the Company was permitted to award Surges under the Company's Incentive Plan. Defendants Brown and Reck and non-party Hartemayer had simply failed to consult the very plan which governed the amounts of stock Surges could be awarded in any given year. This represented bad faith and disloyal conduct.

56. Brown and Reck thereby **_abdicated_** their duties as Compensation Committee members, and engaged in **_ultra vires conduct_** since the massive award of options to Surges vastly exceeded the amount of options permitted under the Incentive Plan.

57. Brown and Reck, having completely abdicated their duties as Compensation Committee members, remained completely oblivious to their wrongdoing for over two years. Finally, a third party brought the massive mistake to the attention of the Company, which was forced to file an amended Proxy Statement on May 14, 2013 admitting that Defendants Brown and Reck had not only botched the huge award to Surges, but had also awarded too many options to one other employee. The amended Proxy stated: "In addition, the Compensation Committee determined that one other grant of stock options, made under the Incentive Plan in 2012, with an exercise price substantially greater than the current trading price of the Company's common stock, had inadvertently exceeded the 750,000 share annual limit by 50,000 shares." The Company was then forced to cancel the portion of Surges's award that exceeded the authorized limit.

58. The abdication of duties by Brown and Reck is particularly glaring in light of the fact that, on April 30, 2013 – two weeks before the revelation of the error in the

awards to Surges, the Board – under the direction of Brown and Reck, as well as the other Director Defendants – recommended that Merge Healthcare shareholders approve an amendment to the Incentive Plan to increase the number of shares available for issuance by an additional 2,000,000 shares:

> As a result of these awards, only 492,954 shares of Common Stock remained available for awards under the equity incentive plan as of April 26, 2013. The Board believes that this remaining pool would be inadequate to enable us to continue to compensate our officers, directors and employees in a manner consistent with the philosophies and goals of our overall compensation program. Accordingly, the Board has determined that it would be in the best interests of the Company and its stockholders to increase the number of shares available for issuance under the equity incentive plan by an additional 2,000,000 shares. The Board, therefore, adopted the Fourth Amendment to the equity incentive plan, subject to stockholder approval of this proposal.

As the Director Defendants stated in the April 30, 2013 Proxy Statement, they recommended this amendment to the Incentive Plan because they found out that the number of available shares remaining in the plan was "inadequate" – presumably after a thorough and careful review of the plan and past awards. But even a cursory review would have – and should have – revealed that this inadequacy was a direct result of the oversized awards made to Surges. Still, Brown and Reck, as well as the other Director Defendants, failed to discover the conceded errors in the awards to Surges. This further demonstrates that Brown and Reck completely abdicated their duties as Directors of the Company and members of the Compensation Committee.

## II.    False or Misleading Statements

59.    On November 9, 2010, Defendants held a press conference to announce the hiring of defendant Surges as CEO. During the earning conference, defendant Surges told investors "we will be investing in sales and marketing to transform Merge Healthcare into a growth company that can dominate our space over the next 36

months." Defendant Surges added "I believe that the market is right, the timing is right for us to build [a] $1 billion company."

60. During 2011, Merge Healthcare's revenues increased by 65% from $140.3 million in 2010 to $232.4 million in 2011, and Defendants reported that they expected revenues to increase in 2012 to the range between $288 and $300 million.

61. Before the end of the Company's 1Q 2012 (ended March 2012), the Company's reporting units were Merge Healthcare and Merge eClinical.

62. On May 7, 2012, Merge Healthcare issued a press release announcing "the creation of two operating groups – Merge Healthcare and Merge DNA (Data & Analytics)," emphasizing that the change would "position the company for growth and ensure greater transparency, predictability and profitability." The Company's press release further explained that "[t]his change in operations [was] being driven by [the Company's] clients' purchasing requirements for subscription-based pricing to align more closely with their long-term operating plans" and that the "two operating groups [were] designed to allow for better focus on [its] two primary end users: providers and consumers." Commenting on the new operational reporting structure, the release also stated in pertinent part as follows:

> Merge Healthcare, which today represents approximately 85% of our total revenue, will continue to be led by Jeff Surges. Merge Healthcare markets, sells and implements interoperability, imaging and clinical solutions to healthcare providers and is moving towards a subscription model for its solutions. Merge DNA will be led by Justin Dearborn and will focus on the emergence of consumerism in healthcare. Merge DNA, also employing a subscription model, will include consumer health stations, clinical trials software and other consumer-focused solutions. In addition, Steve Oreskovich will resume his former role as Chief Financial Officer of the company.

> "Increasing demand for subscription offerings was a significant trend that we witnessed, and responded to, in the first quarter of 2012," said Jeff

Surges, CEO of Merge Healthcare.  "This followed the introduction of our
Honeycomb solution at the RSNA trade show in November, 2011.
Additionally, in Q1, we had three clients purchase multiple solutions with a
total minimum contract value in excess of $2 million on a subscription
model, instead of a traditional perpetual software license arrangement.
With a subscription pricing model, we will recognize significantly lower
upfront revenue, but anticipate more revenue over the contract term.
While we expect our revenue to grow year-over-year in 2012, the trend
towards subscription pricing has changed our initial 2012 revenue and
adjusted EBITDA expectations."

                              *       *       *

As a result of the short-term financial impact inherent in a subscription
pricing model, as opposed to a traditional perpetual license model, we are
withdrawing our financial guidance with respect to 2012 revenue and
adjusted EBITDA that was provided in November 2011.  We will provide
additional metrics later this year that will provide better visibility into our
business. We will provide financial guidance for 2013.

63.    On July 31, 2012, after the close of trading, Merge Healthcare issued a

press release announcing its financial results for the 2Q 2012, ended June 30, 2012,

emphasizing in the caption of the release: "Merge Reports Second Quarter Sales Growth

of 13% – Signs new clients under subscription model and is named #1 VNA in the

world."  For the quarter, Merge Healthcare reported net sales of $62.9 million,

emphasizing that "[s]ubscription-based pricing arrangements in which software,

hardware and professional services are recognized ratably over a number of years

generated 15% of total revenue in the quarter."  The Company also reported a "non-

recurring backlog at quarter end" of $62.4 million.  Commenting on the Company's

financial results and the success of its new subscription-based business model, the

release also emphasized that Merge Healthcare had "[s]igned multiple subscription-

based contracts including an extension of [its] strategic partnership with one of the

largest imaging practices in the country," and quoted defendant Surges, stating, in

pertinent part, as follows:

Our second quarter results reflect solid revenue growth even as we move to a new business model. With our premier client base, industry-leading solutions and expansion into new markets, we are well-positioned for continued success in 2012.

64.     On the morning of August 1, 2012, before the opening of trading, Merge Healthcare also conducted an investor conference during which the Defendants made additional positive representations about the Company's business metrics and financial prospects.

65.     The Company filed its quarterly financial report on Form 10-Q with the SEC on August 6, 2012 as well, which was executed and certified as to veracity under the Sarbanes Oxley Act of 2002 by defendants Surges and Oreskovich.  The Form 10-Q stated that "[o]ur backlog of non-recurring revenue was approximately $28.3 million as of June 30, 2012," and that "subscription revenue backlog as of June 30, 2012 was $34.1 million."  As to the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of June 30, 2012, as required by Rule 13a-15 of the Exchange Act.  This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of June 30, 2012, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

66.     On September 6, 2012, Merge Healthcare announced that "its Board of Directors ha[d] retained Allen & Company LLC, a New York-based investment bank, to assist in exploring and evaluating a broad range of strategic alternatives, including, but not limited to, a sale of the Company or a business combination."

67.     On October 31, 2012, after the close of trading, Merge Healthcare issued a press release announcing its financial results for the 3Q 2012, ended September 30, 2012, emphasizing in the caption of the release: "Merge Reports 2012 Subscription Backlog Up 62% – Delivers third quarter revenue of $61 million and announces 2013 guidance of pro forma revenue range of $265 to $275 million."  For the quarter, Merge Healthcare reported net sales of $60.4 million, emphasizing that: "[s]ubscription-based pricing arrangements in which software, hardware and professional services are recognized ratably over a number of years generated 15.1% of total revenue in the quarter and subscription backlog grew 62% since the prior year end."  The release also explained that Merge Healthcare had "[e]stablished 2013 guidance of revenue in the range of $265 - $275 million with an adjusted EBITDA range of 22-24% and expected subscription backlog growth by the end of 2013 of at least $25 million."  The Company also reported "[s]ubscription and non-recurring backlog at period end" of $71.4 million. Commenting on the Company's financial results and the success of eClinical in particular, the release also emphasized that "eClinical segment signed over 150 contracts in the quarter resulting in a greater than 100% growth in bookings," and quoted defendant Surges, stating, in pertinent part, as follows:

> Our third quarter results continue to demonstrate our transition to a subscription model with both new and existing clients.  Additionally, we are providing annual  guidance for 2013 on revenue, adjusted EBITDA and subscription backlog growth  based on the progress we have made in 2012.

68.     On the morning of November 1, 2012, before the opening of trading, Merge Healthcare conducted an investor conference during which the Defendants made additional positive representations about the Company's business metrics and financial prospects.  The Company also filed its quarterly financial report on Form 10-Q with the SEC on November 1, 2012, which was executed and certified as to veracity under the Sarbanes Oxley Act of 2002 by defendants Surges and Oreskovich.  The Form 10-Q stated that the "Merge Healthcare backlog of non-recurring revenue was approximately $31.1 million as of September 30, 2012," and that "[i]n the third quarter of 2012, subscription revenue was approximately 15% of total net sales and subscription revenue backlog as of September 30, 2012 was $40.3 million."   As to the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of September 30, 2012, as required by Rule 13a-15 of the Exchange Act.  This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer.  Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of September 30, 2012, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

69.     On February 19, 2013, before the opening of trading, Merge Healthcare issued a press release announcing its financial results for the 4Q and fiscal 2013, ended December 31, 2012, emphasizing in the caption of the release: "Merge Reports

Subscription Backlog Up 82% – Delivers fourth quarter sales of $65.1 million and reiterates 2013 guidance of sales range of $265 - $275 million." For the 4Q 2012 and fiscal 2012, respectively, Merge Healthcare reported net sales of $64.7 million and $25.215 million, emphasizing that "[s]ubscription-based pricing arrangements generated 13.5% of total sales in the quarter and subscription backlog grew 13% in the quarter and 82% for the year." The release also "[r]eiterat[ed] 2013 guidance of revenue in the range of $265 to $275 million with an adjusted EBITDA range of 22-24% and expected subscription backlog growth by the end of 2013 of at least $25 million." The release further emphasized that "eClinical signed over 190 contracts in the quarter driving year-over-year bookings growth of 79%." As to backlog, at the end of the 4Q 2012, the release stated that "[s]ubscription and non-recurring backlog at period end" was $76.9 million, up from $56.2 million at the end of fiscal 2011. Addressing the previous announcement that Merge Healthcare had hired investment bankers to explore strategic alternatives, the release now explained that "'[a]fter careful evaluation, we have determined that the alternatives evaluated did not offer more value than our own strategic plan.'" Instead, the release quoted defendant Surges, emphasizing, in pertinent part, as follows:

> We will continue to build upon the proven success over the last few years and further leverage our portfolio of solutions into a more present and ready marketplace than ever before. In addition, we are reiterating annual guidance for 2013 on revenue, adjusted EBITDA and subscription backlog growth.

70.     On the morning of February 19, 2013, before the opening of trading, Merge Healthcare also conducted an investor conference during which Defendants made additional positive representations about the Company's business metrics and financial prospects.

31

71.    The Company filed its annual financial report on Form 10-K with the SEC on March 11, 2013, which was executed by each of the Individual Defendants, and included a certification required by the Sarbanes Oxley Act of 2002 signed by defendants Surges and Oreskovich.  The Form 10-K stated that the "backlog of non-recurring revenue was approximately $31.2 million and $45.1 million as of December 31, 2012 and 2011, respectively," and that "[a]s of December 31, 2012 subscription revenue backlog was $45.6 million."  As to the Company's "Controls and Procedures," the Form 10-K stated, in pertinent part, as follows:

(a) Disclosure Controls and Procedures

Disclosure controls and procedures are controls and other procedures of a registrant designed to ensure that information required to be disclosed by the registrant in the reports that it files or submits under the Exchange Act is properly recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.  Disclosure controls and procedures include processes to accumulate and evaluate relevant information and communicate such information to a registrant's management, including its principal executive and financial officers, as appropriate, to allow for timely decisions regarding required disclosures.

Our control system is designed to provide reasonable assurance that the objectives of the control system are met.  Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2012.  Based on their evaluation as of December 31, 2012, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (as defined in Rules 13a–15(e) and 15d–15(e) under the Securities Exchange Act of 1934, as amended) were effective at the reasonable assurance level to ensure that the information required to be disclosed by us in this Annual Report on Form 10–K was (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and regulations and (ii) accumulated and communicated to our management, including our Chief

Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure

(b) Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our financial statements for external reporting purposes in accordance with GAAP.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2012, using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework. Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2012. The effectiveness of our internal control over financial reporting as of December 31, 2012 has been audited by BDO USA, LLP, an independent registered public accounting firm, as stated in its report which is included below.

(c) Report of Independent Registered Public Accounting Firm

\* \* \*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

In our opinion, Merge Healthcare Incorporated maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on the COSO criteria.

72.     On April 30, 2013, Merge Healthcare announced that it had set a June 18, 2013 annual general shareholder meeting ("AGM") at which it would seek shareholder approval of a an amendment to the Merge Healthcare Incorporated 2005 Equity Incentive Plan in order "to increase the number of shares available for issuance under the equity incentive plan by an additional 2,000,000 shares," which Defendants explained were needed to permit Merge Healthcare to provide its senior executives with the "incentives" required to attract and retain them.  Defendants explained that, but for the increase, the Company would be unable to issue additional options to purchase common stock to its executives as the prior allotment had been fully utilized.

73.     On April 30, 2013, Merge Healthcare issued a press release announcing its financial results for the 1Q 2013, ended March 31, 2013, emphasizing in the caption of the release: "Merge Reports Record First Quarter Sales – Successfully Refinances Existing Debt at Half the Interest Rate."  For the quarter, Merge Healthcare reported net sales of $63.6 million, emphasizing that "[s]ubscription-based pricing arrangements generated 15% of total sales in the quarter and subscription backlog grew 16% in the quarter and 74% in the last year."  The release also explained that Merge Healthcare had "[a]nnounced debt refinancing, which entailed replacing existing 11.75% Notes with a new senior secured credit facilities consisting of a six-year term loan of $255 million and a five-year revolving credit facility of up to $20 million at an initial rate of 6%."  The Company also reported "[s]ubscription and non-recurring backlog at period end" of $76.5 million, up from $63.2 million at the end of 1Q 2012. Commenting on the Company's financial results, the release quoted defendant Surges, stating, in pertinent part, as follows:

Our record first quarter results, combined with our successful debt refinancing, provides a solid start to the year, an immediate benefit to our bottom-line and confidence in our long-term financial health and stability. As health systems look beyond their electronic health record (EHR) implementations and to their next set of strategic priorities, including Meaningful Use Stage Two, we expect to see continued momentum and adoption of our enterprise imaging and subscription-based offerings.

74.     On the morning of May 1, 2013, before the opening of trading, Merge

Healthcare also conducted an investor conference during which Defendants made

additional positive representations about the Company's business metrics and financial

prospects.

75.     The Company also filed its quarterly financial report on Form 10-Q with

the SEC on May 1, 2013, which was executed and certified as to veracity under the

Sarbanes Oxley Act of 2002 by defendants Surges and Oreskovich.  Concerning backlog,

the Form 10-Q stated, in pertinent part, as follows:

Under perpetual license agreements, the software, hardware and professional services are considered to be sources of non-recurring revenue and related backlog.  The fourth quarter is typically the strongest booking quarter for Merge, along with the rest of the healthcare IT industry, while in the first quarter customers focus on implementation of their purchased solutions.  As a result, non-recurring backlog is expected to decline in the first quarter compared to the year-end balance.  The first quarter of 2012 was an anomaly to this trend given that in 2011 and early 2012 Merge was in the process of building out its sales force.  The backlog of non-recurring revenue was $23.8 million and $32.8 million as of March 31, 2013 and 2012, respectively.  We also generate revenue through subscription-based pricing arrangements in which the contract elements are payable by our customers over a number of years.  Generally, these contracts will include a minimum image volume and/or dollar commitment.  As such, revenue from these transactions is recognized ratably over an extended period of time.  Subscription arrangements also include contracts structured with monthly payments (including leases), long-term clinical trials or renewable annual software contracts (with very high renewal rates).  As of March 31, 2013 subscription revenue backlog was $52.8 million, compared to $30.4 million at March 31, 2012.  This significant increase is the result of the continued success of our strategic plan to continue to move to the subscription model.

76.     As to the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of March 31, 2013, as required by Rule 13a-15 of the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of March 31, 2013, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

77.     On May 20, 2013, the market first learned that on May 17th, Merge Healthcare's General Counsel and Corporate Secretary, Ann Mayberry-French, had suddenly and without explanation "resigned."

78.     The Company held its AGM on June 18, 2013 and its shareholders approved the amendment to the Company's Incentive Plan to increase the number of shares of Common Stock authorized for issuance thereunder by 2,000,000 to 18,500,000 shares.

79.     On August 9, 2013, the market would first learn that on August 5, 2013, defendant Surges too had suddenly and without explanation "resigned" as Merge Healthcare's CEO.

80.     That same day, the Company also reported its 2Q 2013 financial results for the period ended June 30, 2013. For the quarter, Merge Healthcare reported a 9%

decline year-over-year in revenue to $57.2 million ***despite reporting an 82%***
***increase in its subscription backlog from the 2Q 2012 period.*** The Company's
GAAP losses also ballooned to $0.30 per share from a loss of just $0.06 per share in 2Q
2012. On an adjusted basis, Merge Healthcare's $0.01 EPS profit fell $0.04 short of
what Defendants had led the market to expect, and its revenue fell well short of the
$65.5 million it had led the market to expect. Quoting defendant Dearborn, the press
release also stated, in pertinent part, as follows:

> Merge's value proposition continues to be very strong in three distinct
> market areas: imaging and interoperability, cardiology, and clinical trials.
> Our spending, on bringing innovative solutions to market, has outpaced
> our end user markets' readiness for a variety of macro-economic reasons
> currently clouding hospital spend decision making. We saw a continued
> reluctance amongst large health systems to move forward with enterprise
> purchases. Unfortunately, this pause has overshadowed the fourth quarter
> in a row of very strong bookings and revenue growth from our clinical
> trials group.

81.    Though Defendants expressly acknowledged in the release that the 2Q
2013 results were "very disappointing," the release further quoted defendant Ferro,
stating, in pertinent part, as follows, in an attempt to avert an outright free-fall in the
Company's stock price:

> Speaking on behalf of all of Merge's Directors, I want to apologize for the
> company's very disappointing second quarter results. We all strongly
> believe in the company, its products and its employees. Our new leaders,
> Justin Dearborn and Nancy Koenig, resurrected Merge five years ago, and
> they are the right team to get the company back on track. I, personally,
> plan to continue to invest in Merge, whether in response to opportunities
> in the market or otherwise.

82.    Citing cost reductions made in the 2Q 2013, the release also warned that
the Company would take a $1 million to $2 million restructuring charge in the 3Q 2013.
However, the release continued to optimistically emphasize "[b]acklog for the quarter in
the clinical trials segment, which is 100% subscription revenue based, grew from

$35.5M at the end of the first quarter of 2013 to $45.7M at the end of the second quarter of 2013."

83.     On the morning of August 9, 2013, before the opening of trading, Merge Healthcare also conducted an investor conference during which Defendants made additional positive representations about the Company's business and financial prospects.

84.     The Company also filed its quarterly financial report on Form 10-Q with the SEC on August 9, 2013, which included a certification required by the Sarbanes Oxley Act of 2002 signed by defendants Dearborn and Oreskovich.  Concerning backlog, the Form 10-Q stated, in pertinent part, that "[t]he backlog of non-recurring revenue was $24.9 million and $28.3 million as of June 30, 2013 and 2012, respectively," and that "[a]s of June 30, 2013 subscription revenue backlog was $61.9 million, compared to $34.1 million at June 30, 2012," stating that "[t]his significant increase is the result of our strategic plan to continue to move to a subscription model."  Concerning the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of June 30, 2013, as required by Rule 13a-15 of the Exchange Act.  This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of June 30, 2013, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive

officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

85. Despite Defendants' efforts to prevent a free-fall in the stock price, on this news, the price of Merge Healthcare stock plummeted more than $2 per share – more than 45% – on extremely unusually high trading volume of more than 8 million shares trading, more than seventeen times the average daily trading volume over the preceding ten trading days.

86. Thereafter, on August 26, 2013, the market would first learn that defendant Ferro too had suddenly and without explanation "resigned."

87. Then, on October 30, 2013, before the opening of trading, Merge Healthcare issued a press release announcing its financial results for the 3Q 2013, ended September 30, 2013, emphasizing in the caption of the release: "Merge generates record cash from business operations in quarter." For the quarter, Merge Healthcare reported net sales of $57.2 million, "[s]ubscription and non-recurring backlog at period end" of $91.9 million, and emphasized that "[s]ubscription backlog grew 73% since the third quarter of 2012, with growth in both Merge Healthcare and DNA segments." Commenting on the Company's financial results, the release quoted defendant Dearborn, stating, in pertinent part, as follows:

> Even though overall third quarter sales were down compared to the prior year, we made tangible progress. We realized a record-breaking quarter in cash collections, voluntarily repaid a portion of our debt, streamlined our business operations, grew our subscription-based backlog and implemented a company-wide strategy for ICD-10 across all applicable solutions. Add the launch of the new iConnect® Network for MU Stage 2, our recent award for 'Best in Interoperability' by Frost & Sullivan and our leadership standings in MU for radiology and vendor neutral archiving (VNA) and we're very well positioned for 2014. Further, while the debt refinancing last quarter resulted in $24 million of one-time expenses and $20 million of cash expenditures, we are seeing the positive impacts this

quarter with lower interest, which will continue to decrease as we make voluntary repayments.

88.     On the morning of October 30, 2013, before the opening of trading, Merge Healthcare also conducted an investor conference during which Defendants made additional positive representations about the Company's business metrics and financial prospects.

89.     The Company also filed its quarterly financial report on Form 10-Q with the SEC on November 4, 2013, which included a certification required by the Sarbanes Oxley Act of 2002 signed by defendants Dearborn and Oreskovich. The Form 10-Q stated that "[t]he backlog of non-recurring revenue was $22.3 million and $31.1 million as of September 30, 2013 and 2012, respectively," that "[a]s of September 30, 2013 subscription revenue backlog was $69.5 million, compared to $40.3 million at September 30, 2012," emphasizing that "[t]his significant increase is the result of our strategic plan to continue to move to a subscription model." As to the Company's "Disclosure Controls and Procedures," the Form 10-Q stated, in pertinent part, as follows:

> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, which were designed to provide reasonable assurance of achieving their objectives, as of September 30, 2013, as required by Rule 13a-15 of the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer. Based on this evaluation, our principal executive officer and principal financial officer have concluded that, as of September 30, 2013, our disclosure controls and procedures were effective at the reasonable assurance level to ensure (1) that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and (2) information required to be disclosed by us in our reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons

performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

90.    The statements referenced above were each materially false and misleading when made as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them, as follows:

(a)    both the existence and value of millions of dollars of eClinical customer contracts had been falsified, and as a result, the Company's reported subscription backlog and its reported increase in backlog was false and overstated during the six quarters ended September 30, 2013;

(b)    the Company was experiencing a "continued reluctance amongst large health systems to move forward with enterprise purchases";

(c)    Merge Healthcare lacked effective internal controls and its disclosure controls were not effective and had not been designed to provide reasonable assurance regarding the reliability of financial reporting;

(d)    Merge Healthcare had a deficiency in its internal controls which resulted in the failure to properly log and verify customer contracts, the failure to appropriately calculate commissions, and the compensation of salesmen based on purported, and even falsified, contract signings rather than actual cash collections; and

(e)    as a result, Defendants lacked a reasonable basis for their positive statements about the Company and its business.

91.    On January 8, 2014, before the opening of trading, Merge Healthcare suddenly announced that the existence and/or value of millions of dollars of customer contracts had been falsified for six quarters ending September 30, 2013, in what it

characterized as a rogue employee's attempt to reach sales quotas and garner $250,000 in additional commissions.   The Company disclosed that day that the former employee, who had worked in its eClinical business, **had resigned in September 2013**.  Merge Healthcare also conceded that the employee in question had expressly acknowledged that the contracts in question were not valid.  The Company also disclosed that its internal investigation had quantified the value of the falsified contracts at approximately $5.8 million and $9.4 million in 2012 and 2013, respectively, stating that those amounts had previously been included in Merge Healthcare's previously reported subscription backlog total during those years.  As a result, the Company stated it was forced to reduce "its previously-announced non-GAAP subscription backlog totals for the Merge DNA segment for the quarterly periods ended June 30, 2012 through September 30, 2013, as follows:

*(amounts in thousands)*

|  | June 30, 2012 | September 30, 2012 | December 31, 2012 | March 31, 2013 | June 30, 2013 | September 30, 2013 |
|---|---|---|---|---|---|---|
| Previously Announced DNA Subscription Backlog | $ 22,213 | $ 29,453 | $ 34,917 | $ 40,943 | $ 50,409 | $ 56,370 |
| Falsified Bookings in Quarter | $ 277 | $ 172 | $ 5,360 | $ 2,864 | $ 4,304 | $ 2,174 |
| Cumulative Falsified Bookings | $ 277 | $ 449 | $ 5,809 | $ 8,673 | $ 12,977 | $ 15,151 |
| Revised DNA Subscription Backlog at Quarter End | $ 21,936 | $ 29,004 | $ 29,108 | $ 32,270 | $ 37,432 | $ 41,219 |

92.     Merge Healthcare also disclosed that day that it had made changes to its compensation plans for eClinical sales personnel to prevent further misconduct by changing from plans based on contract signings to a plan driven by invoicing and cash collections, and that it had remedied defects in its internal controls that had permitted the falsification of sales reports and strengthened its process for logging customer contracts and calculating commissions.

93.     On this news, the price of Merge Healthcare stock, which had traded as high as $4.71 per share during the Relevant Period (on July 24, 2013), fell even further, closing at $2.31 per share on January 8, 2014. ***In the end, the Company suffered a loss of more than $225 million in market capitalization due to the wrongdoing of the Individual Defendants.***

## DAMAGES TO MERGE HEALTHCARE

94.     Merge Healthcare has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

95.     Further, as a direct and proximate result of the Individual Defendants' conduct, Merge Healthcare has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws;

(b)     loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(c)     amounts paid to outside lawyers, accountants, and investigators in connection with Merge Healthcare's internal investigation; and

(d)     loss of revenues and profits due to the falsified contracts.

**DERIVATIVE ALLEGATIONS**

96.     Plaintiff brings this action for the benefit of Merge Healthcare to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

97.     Merge Healthcare is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

98.     Plaintiff is and has been a Merge Healthcare shareholder since March 22, 2006. Plaintiff therefore will adequately and fairly represent the interests of Merge Healthcare in enforcing and prosecuting its rights.

99.     The current Board consists of the following six individuals: Defendants Brown, Maloney, Stearns, Dearborn, Reck, and Koenig. Where, as here, the board is comprised of an even number of directors, the plaintiff need only demonstrate that half of the board is interested or lacks independence. Thus, Plaintiff need only allege demand futility as to three of the six Director Defendants.

**I.     Demand Is Futile as to Dearborn**

100.    In this case, the Company's 2013 Proxy Statement indicates that Defendant Dearborn is not independent under the rules governing independence of directors established by the stock exchange where Merge Healthcare's stock trades – the NASDAQ Global Select Market. He is the CEO of the Company, and as such is completely dependent on the Company for his income and employment. In addition, Dearborn is named as a defendant in the related securities-fraud class action, which eliminates his ability to impartially consider a demand.

101.    Dearborn served as Managing Director and General Counsel of Merrick Ventures, LLC, an affiliate of Merrick, from January 2007 until his appointment as Chief Executive Officer on June 4, 2008.  Merrick RIS, LLC ("Merrick") beneficially owned controlling blocks of Merge Healthcare stock during the Relevant Period.  For example, as of June 30, 2010, 37.0% of Merge Healthcare's outstanding common stock was owned by Merrick or its controlling shareholders, including Defendant Ferro.[1] Ferro, who along with Dearborn is a defendant in the related securities-fraud class action complaint, also served as the chairman and chief executive officer of Merrick. Ferro indirectly owned and controlled the term note and indirectly owned all of the shares of common stock owned by Merrick.  Accordingly, a demand upon Defendant Dearborn is futile and, therefore, excused.

## II.    Demand Is Futile as to Brown and Reck

102.    Defendants Brown and Reck, as members of the Compensation Committee, have abdicated their fiduciary duties in the past, thus demonstrating that they are not independent and objective and instead simply "sign off" on whatever requested action is put before them for signature by the Company's executives.

103.    As a stark example, on November 5, 2010, in connection with Defendant Surges becoming Merge Healthcare's CEO, Defendants Brown and Reck, as members of the Compensation Committee, granted Surges options to purchase 1,500,000 shares of the Company's common stock.  This represented 975,000 more shares than what was permitted to award Surges under the Company's Incentive Plan.  Defendants Brown and

---

[1] Merrick Venture Management Holdings, LLC ("Merrick Holdings") beneficially owned, as of April 26, 2013, 22,105,857 shares of Merge Healthcare's outstanding Common Stock.  In addition, Merrick Ventures, LLC, ("Merrick Ventures"), a private investment firm, beneficially owned, as of April 26, 2013, 4,925,441 shares of Merge Healthcare's outstanding common stock.

Reck had simply failed to consult the very plan which governed the amounts of stock Surges could be awarded in any given year. This represented bad faith and disloyal conduct.

104. Brown and Reck thereby ***abdicated*** their duties as Compensation Committee members, and engaged in ***ultra vires conduct*** since the massive award of options to Surges vastly exceeded the amount of options permitted under the Incentive Plan. Moreover, because Brown and Reck had completely abdicated their duties to ensure that the options award to Surges was merited and complied with the Incentive Plan, they remained oblivious to the ***ultra vires*** nature of their options award to Surges for over two and one-half years! In fact, so complete was the abdication by Brown and Reck with respect to their duties as Compensation Committee members that they never discovered their unlawful award of options to Surge on their own. It took a third party to discover the *ultra vires* award, who then sent a letter to the Company pointing out the unlawful award. Upon receipt of this letter, the Company was forced to admit the glaring error committed by Defendants Brown and Reck and file a special, supplementary Proxy Statement disclosing the unlawful awards and belatedly cancelling that portion of the options which exceeded the allowable limit. On May 14, 2013, Merge Healthcare was forced to file a special, amended Proxy Statement in which it was forced to admit the following: "In the second quarter of 2013, following receipt of a letter regarding this matter, the Company discovered that Surges'[s] stock-option grant on November 5, 2010, inadvertently exceeded the 750,000 share limit on the number of stock options that may be granted to any individual participant within any calendar year under the Company's [Incentive Plan] by 975,000 shares." The amended Proxy Statement also stated: "As a result, the Compensation Committee, pursuant to its

authorization under the Incentive Plan, and with Mr. Surges'[s] consent, has caused options covering 975,000 shares of common stock granted to Mr. Surges in November 2010 to be cancelled for all purposes under the Incentive Plan."

105.    In the May 14, 2013 amended Proxy Statement, the Company was also forced to admit that Defendants Brown and Reck had not only botched the huge award to Surges, but also awarded too many options to one other employee. The amended proxy stated: "In addition, the Compensation Committee determined that one other grant of stock options, made under the Incentive Plan in 2012, with an exercise price substantially greater than the current trading price of the Company's common stock, had inadvertently exceeded the 750,000 share annual limit by 50,000 shares. Those excess stock options have been cancelled, and no new grant will be made at this time."

106.    Finally, contradicting prior statements made by the Individual Defendants assuring investors that the Company had adequate internal controls, the May 14, 2013 amended Proxy Statement also conceded that the Company's internal controls were not in fact adequate and needed to be revised. The amended proxy stated: "The Compensation Committee has also reviewed the circumstances surrounding these inadvertent grants of options in excess of the annual limitation and established new internal reporting procedures with respect to future grants under the Incentive Plan. Such procedures are designed to prevent future errors with respect to awards under the Incentive Plan."

107.    The errors admitted in the May 14, 2013 amended Proxy Statement are particularly glaring in light of the fact that Brown and Reck, together with the other Director Defendants, recommended to shareholders to increase the number of available shares in the Incentive Plan on April 30, 2013, on the basis that the remainder of

47

available shares was inadequate. Before making that recommendation, Brown and Reck had presumably reviewed the Incentive Plan and previous awards. But Brown and Reck apparently failed to discover the errors in the awards to Surges during that review. Their failure serves as additional evidence of the abdication of their duties. Because Brown and Reck face a substantial likelihood of liability for their breaches of fiduciary duties, demand on them is futile and therefore excused.

### III.  Demand Is Futile as to Brown, Reck, and Stearns

108.  Defendants Brown, Reck, and Stearns, as members of the Audit Committee, reviewed and approved the false financial statements. As members of the Audit Committee during the relevant period, Brown, Reck, and Stearns had additional and heightened responsibilities for ensuring the reliability of financial reporting and compliance with applicable laws and regulations. The Audit Committee was also tasked with reviewing the quality, adequacy, and effectiveness of the Company's internal and financial controls. Brown, Reck, and Stearns fell well short of their duties. As alleged herein, Brown, Reck, and Stearns knowingly or recklessly made and allowed the Company to make improper statements related to Merge Healthcare's backlog, financial results and business operations.

109.  Brown, Reck, and Stearns breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein. Thus, Brown, Reck, and Stearns face a substantial likelihood of liability for their breaches of fiduciary duties. Because the Audit Committee Defendants face a substantial likelihood of liability, any demand upon them is futile.

48

**IV.    Demand Is Futile as to All Director Defendants**

110.    Demand is futile as to Defendants Dearborn, Brown, Reck, Stearns Maloney, and Koenig because they each breached their duty of candor by failing to promptly disclose to Merge Healthcare's shareholders and the stock market the fraud committed by the former employee who resigned in September 2013 after admitting to falsifying contracts.

111.    The Company recently disclosed that the Board learned of this fraudulent conduct in September 2013, yet intentionally delayed disclosing this material information to the market for over three months.  On January 8, 2014, over three months after learning the true facts, the Board finally and belatedly disclosed to the market that a former employee's attempt to reach sales quotas and garner $250,000 in additional commissions had simply fabricated sales orders.   The Company disclosed that day that the former employee, who had worked in its eClinical business, ***had resigned in September 2013***.  The Company's belated January 8, 2014 SEC filing specifically noted that the wrongdoing had been reported back in September 2013 by management to the Audit Committee (Defendants Brown, Reck, and Stearns), but that Brown, Reck, and Stearns failed to disclose the fraud at the time:  "After initially identifying the issue, the company's senior management conducted a preliminary internal investigation and reported its findings to the Audit Committee of the company's Board of Directors."  Although failing to report the fraud at the time to the Company's shareholders and the public, upon information and belief Defendants Brown, Reck, and Stearns notified their fellow Board members of these issues at the time – Defendants Dearborn, Maloney and Koenig.

112.    Fraud is always material, in any amount, and the Board should have disclosed the employee's conduct back in September 2013 when the employee was forced to resign.  By failing to disclose this material information, which they knew or recklessly disregarded, the Board members breached their fiduciary duties of candor and loyalty.

113.    The Director Defendants also breached their duty of candor by not disclosing the true reasons for the resignations of the Company's General Counsel, Ann Mayberry-French, and of Defendants Surges and Ferro.  On May 20, 2013, the market first learned that on May 17th, Merge Healthcare's General Counsel and Corporate Secretary, Ann Mayberry-French, had suddenly and without explanation "resigned."  On August 9, 2013, the market first learned that on August 5, 2013, Defendant Surges had suddenly and without explanation "resigned" as Merge Healthcare's CEO.  The Director Defendants never disclosed to the market that these were "forced" resignations due to such individuals' involvement in the wrongdoing.  The Director Defendants also breached their duty of candor by not disclosing the true reasons for the August 26, 2013 "resignation" of Defendant Ferro, who was also forced to resign for his involvement in the wrongdoing.

114.    In light of their conduct, which has subjected the Company to being named as a defendant in a federal securities class action, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.  Because all the Board members breached their duties of good faith, candor, and loyalty by not promptly disclosing the fraud which occurred and not promptly disclosing the reasons for the "resignations" of  Mayberry-French, Surges, and Ferro, such director defendants face a

substantial likelihood of liability in this action and are therefore interested. Breaches of the duties of good faith, candor and loyalty cannot be indemnified by the Company.

115.    Furthermore, demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

116.    Specifically, Defendants Brown, Maloney, Stearns, Dearborn, Reck, and Koenig were ultimately responsible for the Company's operations, financial statements, and internal controls. However, in complete abdication of their fiduciary duties, Defendants Brown, Maloney, Stearns, Dearborn, Reck, and Koenig either participated in or were recklessly unaware of the unlawful scheme to inflate the Company's backlog, earnings and/or revenue figures, which was intended to make the Company appear more profitable and attractive to investors. As a result, Defendants Brown, Maloney, Stearns, Dearborn, Reck, and Koenig breached their fiduciary duties. Thus, Defendants Brown, Maloney, Stearns, Dearborn, Reck, and Koenig face a substantial likelihood of liability, and demand upon them is futile.

## V.    Demand Is Futile for Additional Reasons

117.    Defendants Brown, Maloney, Stearns, Dearborn, Reck, and Koenig also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal and financial controls in place to prevent the dissemination of improper public disclosures. As indicated by the allegations contained herein and by the Company's own admissions, Merge Healthcare did not have in place, or failed to properly implement, an effective system of internal financial controls. Indeed,

Defendants Brown, Maloney, Stearns, Dearborn, Reck, and Koenig knowingly or recklessly disregarded any such controls in directly and/or indirectly issuing improper statements in the Company's press releases and filings with the SEC regarding the Company's financial results and business operations. Accordingly, these Defendants breached their fiduciary duties in failing to implement such financial controls and, therefore, face a substantial likelihood of liability. Demand upon them is futile.

118. Merge Healthcare has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Merge Healthcare any part of the damages Merge Healthcare suffered and will continue to suffer thereby. Indeed, even as to the employee which Merge Healthcare has said committed fraud by falsifying contracts, the Company has not sued the employee and allowed the employee to resign rather than firing the employee and suing him/her. Thus, any demand on these Defendants would be futile.

119. Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith, intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

120.    The acts complained of herein constitute violations of fiduciary duties owed by Merge Healthcare's officers and directors and these acts are incapable of ratification.

121.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged herein by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Merge Healthcare.  The directors' and officers' liability insurance policy covering the Director Defendants may contain provisions that eliminate coverage for any action brought directly by the Company against these Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of Merge Healthcare, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director Defendants is futile and, therefore, excused.

122.    Thus, for the reasons set forth above, at least a majority, if not all, of the Individual Defendants currently serving on the Board cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### Count I
### Against the Individual Defendants for Breaches of Fiduciary Duties

123.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

124.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Merge Healthcare's business and affairs, particularly with respect to issues regarding the Company's financial viability.

125.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

126.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breaches of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Merge Healthcare.

127.    In breach of their fiduciary duties owed to Merge Healthcare, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to properly oversee Merge Healthcare's business, rendering them personally liable to the Company for breaching their fiduciary duties.

128.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements.  Defendants had actual knowledge of

54

the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Merge Healthcare's securities.

129. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

130. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Merge Healthcare has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

### Count II
### Against the Individual Defendants for Abuse of Control

131. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Merge Healthcare, for which they are legally responsible.

133. As a direct and proximate result of the Individual Defendants' abuse of control, Merge Healthcare has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Merge Healthcare has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**Count III**
**Against the Individual Defendants for Gross Mismanagement**

134.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

135.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Merge Healthcare in a manner consistent with the operations of a publicly-held corporation.

136.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duties alleged herein, Merge Healthcare has sustained and will continue to sustain significant damages.

137.    As a result of the misconduct and breaches of duties alleged herein, the Individual Defendants are liable to the Company.

138.    Plaintiff, on behalf of Merge Healthcare, has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Merge Healthcare and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to Merge Healthcare;

C.    Determining and awarding to Merge Healthcare the damages sustained by the Company as a result of the violations set forth above from each of the Individual

Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.      Directing Merge Healthcare and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Merge Healthcare and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(1)      a proposal to strengthen the Board's supervision of the Company's sales force and the requirement for booking sales and revenue;

(2)      a provision to permit the shareholders of Merge Healthcare to nominate at least two candidates for election to the Board; and

(3)      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.      Awarding Merge Healthcare restitution from defendants, and each of them;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 21, 2014              Respectfully submitted,

HUBERT C. PINCON, derivatively on behalf of MERGE HEALTHCARE INCORPORATED

s/ Rowena T. Parma

Rowena T. Parma

Edward T. Joyce
Rowena T. Parma
THE LAW OFFICE OF
   EDWARD T. JOYCE & ASSOCIATES, P.C.
135 South La Salle Street, Suite 2200
Chicago, Illinois 60603
Telephone: (312) 641-2600
Facsimile: (312) 641-0360
E-mail: ejoyce@joycelaw.com
          rparma@joycelaw.com

Francis A. Bottini, Jr.
Albert Y. Chang
BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
E-mail: fbottini@bottinilaw.com
          achang@bottinilaw.com

*Attorneys for Plaintiff*

58

**VERIFICATION**

I, Hubert C. Pincon, verify that:

1.      I am a shareholder of Nominal Defendant Merge Healthcare Incorporated (the "Company"). I have continuously held the Company's common stock since March 22, 2006.

2.      I have reviewed the allegations made in the foregoing Verified Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.

3.      Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 14, 2014, at Larchmont, New York.

_____
Hubert C. Pincon